IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIKOUSIS LEGACY INC., <br><br> Plaintiff, <br><br> v. <br><br> B-GAS LIMITED A/K/A BEPALO LPG SHIPPING LTD., et al., <br><br> Defendants. | Case No. 22-cv-03273-CRB <br><br> **ORDER GRANTING MOTION TO VACATE** |

Pursuant to Rule B of the Supplemental Rules for Certain Admiralty or Maritime Claims,[1] the Court authorized the attachment of the vessel M/T Berica on June 6, 2022. On June 28, 2022, Defendant Bergshav Aframax, Ltd. ("Aframax"), owner of the Berica, made a restricted appearance under Rule E of the Supplemental Rules for Certain Admiralty or Maritime Claims,[2] moving to vacate the attachment of the Berica, as represented by the substitute security posted for the Berica's release. See Mot. (dkt. 34); see also Reply (dkt. 41). Plaintiff Sikousis Legacy Inc. and Plaintiffs-in-Intervention Bahla Beauty Inc. and K Investments Inc. (collectively "Plaintiffs") opposed the motion, arguing that attachment is appropriate in light of the alter ego relationships between Aframax and a family of related corporate entities in Cyprus and Norway. See generally

---

[1] Rule B provides in part that "If a defendant is not found within the district when a verified complaint praying for attachment and the affidavit required by Rule B(1)(b) are filed, a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property—up to the amount sued for—in the hands of garnishees named in the process." Rule B(1)(a).

[2] Rule E provides in part that "Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules." Rule E(4)(f).

Opp'n (dkt. 39). The Court held a motion hearing on July 29, 2022. See Motion Hearing (dkt. 47); Transcript (dkt. 53). At that time, the Court set a continued Rule E hearing for November 2022, allowed Plaintiffs to do some "limited discovery in advance of that hearing in support of their alter ego claims," and set a discovery cut-off date of September 2022. See Order Continuing Hearing, Permitting Discovery, and Setting Briefing Schedule (dkt. 48). Plaintiffs were then to file a brief in support of their position, and Aframax was permitted to file a response. Id.[3]

Discovery has now taken place, and the parties have each filed a supplemental brief. See Plaintiffs' Sup. Br. (dkt. 58); Aframax Sup. Br. (dkt. 62). In fact, Plaintiffs also filed an additional brief, purportedly pursuant to Civil Local Rule 7-3(c), see Plaintiffs' Sup. Reply (dkt. 63), which was not permitted by the Court, see Order Continuing Hearing, Permitting Discovery, and Setting Briefing Schedule (allowing "a brief" by Plaintiffs and "a response" by Aframax), and which Aframax appropriately moves to strike, see Ex Parte Application (dkt. 64) at 1–3 (explaining that Rule 7-3(c) does not apply). The Court GRANTS the motion to strike, and now turns to the merits of the motion to vacate.

I.   **BACKGROUND**

Defendants in this case— B-Gas Limited a/k/a Bepalo, LPG Shipping Ltd., B-Gas A/S, Bergshav Shipping Ltd., B-Gas Holding, Ltd., Bergshav Aframax, Ltd., Bergshav Shipholding AS, Bergshav Invest AS, LPG Invest AS, and Atle Bergshaven—"are corporate entities established in Norway and Cyprus," as well as an individual, Atle Bergshaven, the chairman of the board of all of the other named corporate defendants, who lives in Norway. Compl. (dkt. 1) at 2, ¶¶ 3–44.[4] Plaintiffs are arbitration award-creditors under three maritime London arbitration awards against award-debtor B-Gas Ltd., now known as Bepalo LPG Shipping Ltd.[5] Opp'n at 1. The $7.5M arbitration award stems from B-Gas Ltd.'s repudiation of a bareboat charter party contract. Id. at 2. According to

---

[3] The dates for the close of discovery, briefing, and hearing subsequently changed. See Joint Stip. (dkt. 57).
[4] This order uses "Complaint" to mean the Sikousis Complaint.
[5] This order uses the names "B-Gas Ltd." and "Bepalo" interchangeably.

2

the Complaint, in 2019, Sikousis chartered a vessel to B-Gas Ltd.; Sikousis delivered the vessel to B-Gas Ltd. and then B-Gas Ltd. demanded a 50% reduction of the charter hire. Compl. ¶¶ 13–16.  Sikousis rejected the proposal and insisted on being paid as provided in the charter agreement.  Id. ¶ 17.  B-Gas Ltd. breached the agreement, and Sikousis initiated, and later prevailed in, arbitration.  Id. ¶¶ 18–21.  Bepalo subsequently declared insolvency.  Id. ¶ 22.

The issue before the Court is whether Plaintiffs can recover from Aframax (the entity that owns the Berica and the only defendant to have appeared in this case) when they have a judgment against Bepalo (the entity that breached its contract with Plaintiffs). Plaintiffs argue that they can, because Aframax and all of the related corporate entities are alter egos of each other.  Key to understanding the relationship between B-Gas Ltd./Bepalo and Aframax is the corporate structure of the Bergshav Group at different times.

Plaintiffs assert that the organizational structure of the Bergshav Group looked like this in April and May of 2020:



3

Id. ¶ 32. One can see that B-Gas Ltd. and Aframax were initially both subsidiaries of Bergshav Shipping Ltd. Id. In addition, one can see that B-Gas Ltd. owned a number of charters, and that Aframax owned the Berica. Id.

Plaintiffs allege that Bergshav Shipholding AS incorporated B-Gas Holding Ltd. and transferred to B-Gas Holding Ltd. "all of the rights, title and interest in B-Gas Limited." Id. ¶¶ 40–41. Plaintiffs allege that this "gratuitous transfer by Bergshav Shipping Ltd. of its controlling interest over B-Gas Limited to the newly-minted B-Gas Holding Ltd. corporate entity without any assets, was a sham transaction of no lawful economic or financial benefit whatsoever to Bergshav Shipping Ltd. or to B-Gas Holding, Ltd." Id. ¶ 43. Plaintiffs assert that B-Gas Ltd. was removed from the control of its parent company, Bergshav Shipping, Ltd., and put under the complete control of B-Gas Holding, Ltd., "with a fictitious sale for one US Dollar." Opp'n at 13 (citing Zambartas Decl. ¶ 11 and GZ Ex. 3 thereto; id. ¶ 15 and GZ Ex. 5 thereto at 9 and 13; id. ¶ 16 and GZ Ex. 2 thereto at 21). B-Gas Holding Ltd. was only intended to be a "conduit for the insulation of Bergshav Shipping Ltd. from liability to the creditors of B-Gas Limited." Id. ¶ 45. Atle Bergshaven then incorporated a new entity, LPG Invest AS, id. ¶ 46, and transferred to LPG Invest AS the entire ownership interest that B-Gas Ltd. had in the vessel B-Gas Maud, the "sole trading asset of B-Gas Maud Ltd," for a fraction of its value. Id. ¶¶ 49, 51; see also Opp'n at 14 (asserting that the B Gas Champion, B Gas Commander, and B Gas Crusader were also sold to LPG Invest AS for "a total price of USD 100,000 and a credit of USD 100,000.").

At the conclusion of a series of maneuvers, Plaintiffs allege that the Bergshav Group's organization looked like this:

//
//
//
//
//

4



Id. ¶ 65. One can see that B-Gas Ltd. and Aframax no longer had the same direct parent company, and that B-Gas Ltd. no longer owned the charters, although Aframax still owned the Berica. Id.

Plaintiffs allege that the changes in the organizational structure between Table I and Table III reflect an effort to strip B-Gas Ltd. of "every tangible asset it had." Id. ¶ 67. They allege that "[t]here is substantial overlapping in the ownership of the corporate entities made defendants in this proceeding." Id. ¶ 76. And they allege that "Defendant Atle Bergshaven and his various corporate surrogates caused the methodical transfer [of] all of B-Gas Limited's assets to newly established entities in advance of its anticipated repudiation of the Bareboat Charter in order to hinder, frustrate, and thwart Plaintiff's recourse." Id. ¶ 83.

Sikousis brought suit in this district on June 6, 2022, requesting quasi-in-rem attachment, under Rule B, of the Berica as security to satisfy its $7.5M arbitration award against B-Gas Ltd. See Compl.; see also K Investments Inc. Intervenor Compl. (dkt. 18); Bahla Beauty Inc. Intervenor Compl. (dkt. 21). Sikousis alleged that because Defendants

could not be found in this district, all assets of the defendants presently in the district, including the Berica, should be attached and garnished in an amount sufficient to answer Sikousis's claim. Compl. at 28; Mot. for Writ (dkt. 3). The Court issued an Order Authorizing Issuance of Process of Maritime Attachment and Garnishment. See Order on Writ.

Aframax filed a motion to vacate the attachment. See Mot. After the July 29 motion hearing, the Court allowed for some limited discovery and supplemental briefing on Plaintiffs' alter ego allegations. See Order Continuing Hearing, Permitting Discovery, and Setting Briefing Schedule. The Court specifically encouraged Plaintiffs to focus on "(1) the relationship of B-Gas Limited/Bepalo to Bergshav Shipholding AS; and (2) the relationship of Bergshav Aframax to the alleged fraud." Id.

## II.  LEGAL STANDARD

To obtain pre-judgment attachment under Rule B, a plaintiff must show that (1) it "has a valid prima facie admiralty claim against the defendant"; (2) the "defendant cannot be found within the district"; (3) "property of the defendant can be found within the district"; and (4) "there is no statutory or maritime" bar to attachment. Equatorial Marine Fuel Mgmt., 591 F.3d 1208, 1210 (9th Cir. 2010).

As to alter ego, "[f]ederal courts sitting in admiralty generally apply federal common law." Pacific Gulf Shipping Co. v. Vigorous Shipping & Trading S.A., 992 F.3d 893, 897 (2021) (citing Chan v. Society Expeditions, Inc., 123 F.3d 1287, 1294 (9th Cir. 1997)).[6] "To satisfy the alter ego exception to the general rule that a subsidiary and the

---

[6] Aframax spends some time in its brief arguing that the Court should also look to Norwegian and Cypriot veil-piercing law because "the United States does not have the strongest connection to the relevant transaction." Aframax Sup. Br. at 4. But Aframax asserts that the bar is "high" to piercing the corporate veil in Norway, and that veil piercing only occurs in "extremely limited circumstances" in Cyprus, id. at 5, which is not terribly different from the standard in this country, see, e.g., Dole Food Co. v. Patrickson, 538 U.S. 468, 475 (2003) ("The doctrine of piercing the corporate veil, however, is the rare exception, applied in the case of fraud or certain other exceptional circumstances"). Moreover, Aframax goes on to state that "the question of law is of reduced significance because all potentially applicable law, whether Norwegian, Cypriot, or federal maritime common law, requires a showing of fraud, and Plaintiffs have expressly admitted that Aframax was not involved in the underlying fraud which forms the basis of their corporate

parent are separate entities, the plaintiff must make out a prima facie case '(1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice.'" Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd., 328 F.3d 1122, 1134 (9th Cir. 2003) (quoting Doe v. Unocal Corp., 248 F.3d 915, 926 (9th Cir. 2001) (per curiam)).

The Ninth Circuit recently explained:

> To pierce the corporate veil, a party must show that (1) the controlling corporate entity exercise[s] total domination of the subservient corporation, to the extent that the subservient corporation manifests no separate corporate interests of its own. . . (2) injustice will result from recognizing [the subservient entity] as a separate entity . . . and (3) the controlling entity had a fraudulent intent or an intent to circumvent statutory or contractual obligations.

Pacific Gulf Shipping Co., 992 F.3d at 898 (internal quotation marks and citations omitted).[7] "[S]uperficial indicia of interrelatedness' such as shared office space and phone numbers are 'not dispositive of the [alter-ego] question'"; instead, courts are to look at "a corporation's 'practical operation' as 'more instructive.'" Id. (quoting Coastal States Trading, Inc. v. Zenith Navigation, S.A., 446 F. Supp. 330, 334 (S.D.N.Y. 1977)).

Pursuant to Rule E, the plaintiff has the burden of showing why the attachment should not be vacated. See Rule E(4)(f). The Ninth Circuit has apparently not articulated what standard applies, but there is support for the notion that there must be "probable cause" to attach property. Tefida v. 1,925 Cartons of Crab, No. 2:13-cv-464-RSM, 2013

---

veil-piercing theory of liability." Aframax Sup. Br. at 6.
[7] See also id. (indicia for piercing the corporate veil include "(1) disregarding corporate formalities such as, for example, in issuing stock, electing directors, or keeping corporate records; (2) capitalization that is inadequate to ensure that the business can meet its obligations; (3) putting funds into or taking them out of the corporation for personal, not corporate, purposes; (4) overlap in ownership, directors, officers, and personnel; (5) shared office space, address, or contact information; (6) lack of discretion by the allegedly subservient entity; (7) dealings not at arms-length between the related entities; (8) the holding out by one entity that it is responsible for the debts of another entity; and (9) the use of one entity's property by another entity as its own.").

WL 4049011, at *3 (W.D. Wash. Aug. 9, 2013) (adding, "[i]n this context, the probable cause standard roughly equates to whether plaintiff can make out a prima facie case."); OS Shipping Co. Ltd v. Global Maritime Trust(s), No. 11-cv-377-BR, 2011 WL 1750449, at *5 (D. Or. May 6, 2011) ("the prevailing test appears to be a 'probable cause' standard that requires Plaintiffs to demonstrate the evidence shows a fair or reasonable probability that Plaintiffs will prevail on their alter-ego claim."). The Court's job is therefore not to determine the "ultimate merits of [the] alter-ego claim," but, "based on the record to date," to "determine whether [Sikousis satisfies] the probable-cause standard by showing [that it is] reasonably likely to prevail." See OS Shipping Co. Ltd, 2011 WL 1750449, at *5. The parties did not dispute at the motion hearing that the probable cause standard applied,[8] Transcript at 6:10–11, and the Court will apply it again here.

### III. DISCUSSION

Plaintiffs took extensive written discovery since the motion hearing and now argue that they have met their burden of "show[ing] why the arrest or attachment should not be vacated." See generally Plaintiffs' Sup. Br.; Rule E(4)(f). Aframax asks the Court to envision the many links between Bepalo and Aframax in Table III (replicated above), arguing that Plaintiffs' proof fails in two places: (A) at the first link connecting the two companies, because Bepalo is not "dominated and controlled" by the Bergshav Group, and (B) at the last link connecting the two companies, because there is no relationship between

---

[8] However, in its supplemental brief, Aframax argues that now that there has been jurisdictional discovery, the Court should apply a preponderance of the evidence standard. See Aframax Sup. Br. at 6–7. The authority that Aframax cites in support of this point is two district court cases from outside of the Ninth Circuit. See id. (citing Oldendorff Carriers GMBH & Co., KG v. Grand China Shipping (Hong Kong) Co., No. 2:12-CV-74, 2013 WL 3937450, at *2 (S.D. Tex. July 30, 2013) and Hawknet Ltd. v. Overseas Shipping Agencies, No. 07-Civ-5912 (NRB), 2009 WL 1309854, at *2 (S.D. N.Y. May 6, 2009)). But Oldendorff and Hawknet both explicitly applied the preponderance standard after allowing an evidentiary hearing; this Court has not had an evidentiary hearing. Moreover, Aframax cites to no authority within the Ninth Circuit applying a preponderance of the evidence standard, and authority from within the Circuit suggests that the probable cause standard still applies. See, e.g., OS Shipping Co. v. Glob. Mar. Tr.(s) Priv. Ltd., No. 11-CV-377-BR, 2011 WL 1750449, at *5 (D. Or. May 6, 2011) (holding, after depositions and hundreds of pages of exhibits, "the prevailing test appears to be a 'probable cause' standard").

8

Aframax and the alleged fraud. Aframax also addresses (C) Plaintiffs' additional arguments.

### A. First Link: Bepalo

#### 1. Previous Briefing

In the motion to vacate, Aframax argued that the evidence establishes that Bepalo is a separate and distinct entity from Bergshav Shipholding AS. Mot. at 15. It asserted that:

- There is an "incomplete unity of ownership" between Bergshav Shipholding AS and Bepalo;
- There are formal agreements in place to protect Bepalo's minority shareholders (who own 49% of Bepalo) from unilateral action by B-Gas Holding Ltd.[9];
- Two Bepalo board members were appointed by minority shareholders;
- Supermajority votes, which include at least one minority appointed director, are necessary to take certain corporate actions;
- Bepalo was sufficiently capitalized until the pandemic;
- There is no improper commingling of funds or sharing of property;
- The daily operations of the companies are kept separate; and
- There is no sharing of property.

Id. at 16–17. Aframax pointed to the Shareholders' Agreement, which lays out various actions that require a supermajority, and argued that "if Bergshav Shipholding AS (or Atle Bergshaven individually) had intended for Bepalo to merely be an indistinguishable extension of its majority-shareholding parent company(s), it would not have agreed to limit its control over Bepalo." Id. at 17–18 (citing Mot. Ex. G-2).

Aframax also relied on the declaration of Andreas Hannevik, deputy CEO of Bergshav Shipholding AS, which purports to set out the legitimate "circumstances and reasoning involved in first attempting to secure additional liquidity during a time of

---

[9] See Hannevik Decl. ¶ 5 (attaching Bepalo Shareholders' Agreement), Ex. G-2 (Shareholders' Agreement).

9

economic stress brought on by the global pandemic, and then the unfortunate but necessary decision to wind down Bepalo's business." Id. at 19 (citing Hannevik Decl. (dkt. 34-7) ¶¶ 10, 11). And it attached Board Meeting Minutes which, it asserted, demonstrate that the "decisions to obtain liquidity via sale-leasebacks of its vessels, and later to wind down the company, were done according to proper corporate formalities and not simply at the sole whim of Atle Bergshaven." Id. at 19 (citing Mot. Ex. G-4) (meeting minutes from B-Gas Ltd.'s Board of Directors meetings on April 6, 2020, May 5, 2020 (which included "Pursue legal possibilities on company structure in Cyprus, Norway and Denmark"), May 15, 2020, July 3, 2020, August 11, 2020).

Plaintiffs responded that, while Aframax argues that control over B-Gas Limited was exercised by a supermajority under a Shareholders' Agreement, "there is no proof of that." Opp'n at 18. They went on: "The October 14, 2011 voting agreement of the shareholders of B-Gas Limited is private and governed by Norwegian law, and is subject to arbitration in Norway. It was not made part of any public corporate record in Cyprus where B-Gas Limited was incorporated" and "Cypriot Articles of Incorporation govern and prevail over it." Id. (citing Zambartas Decl. ¶ 61[10]).

At the time of the motion hearing, the Court found the Hannevik declaration to be rather persuasive evidence that Bepalo is not dominated and controlled by Bergshav Shipholding AS in its practical operation.

### 2. New Evidence

Given the Court's suggestion that Plaintiffs focus discovery in part on "the relationship of B-Gas Limited/Bepalo to Bergshav Shipholding AS," see Order Continuing Hearing, Permitting Discovery, and Setting Briefing Schedule, the Court expected that

---

[10] Zambartas declared: "It is brought to my attention that the shareholders of B-Gas Limited had, some years ago, entered into a shareholders agreement, and on this basis they dispute whether the controlling majority shareholder could alone exercise control over decisions of the shareholders. However, having reviewed the Articles of Association of B-Gas Limited/Bepalo, I do not find any of the provisions of the shareholders' agreement having been incorporated in the Articles. Accordingly, as the reserved matters have not been incorporated into the Articles[,] the terms in the Articles which regulate the decision-making processes and procedures of the shareholders should prevail." Id.

Plaintiffs would do further discovery on Bepalo. But Plaintiffs apparently chose not to take depositions of Bergshav Group representatives, see Aframax Sup. Br. at 2, and did not delve into issues of Bepalo's minority shareholders' rights in written discovery, id. at 9. In fact, Plaintiffs just briefly addressed the issue of Bepalo's independence in their supplemental brief. See Plaintiffs' Sup. Br. at 4 (stating that "From its inception, B-Gas Limited was held by Bergshav Shipping Ltd . . . which owned 51% of its shares. The remaining 49% of B-Gas Limited's shares were held by Lorentzen Skibs AS and Pareto Secondary Opportunity Fund AS."), 5 ("Two (2) Norwegian individuals—Jan Haakon Pettersen and Nicolai Eirik Lorentzen—were directors on the board of B-Gas Limited appointed by the respective minority shareholders,"). Plaintiffs' arguments about corporate control as to Bepalo were fairly conclusory, see, e.g., id. at 7 (". . . it is obvious that Bergshav Shipholding AS exercised complete control of the corporate entities of its Cypriot Arm."), 19 ("The domination and control of B-Gas Limited by the Bergshaven Group, i.e., Bergshav Shipholding AS, is also indisputable. . . ."), and their examples of corporate control generally do not pertain to Bepalo itself, see, e.g., id. at 5–6 (example of Bergshav Management Co. AS directing Bergshav Shipping Ltd. activity). While Plaintiffs describe the Bergshaven Group's "plan" to strip assets from B-Gas limited, see id. at 8–11, they do not address the Bepalo Shareholders' Agreement and its role. See Aframax Sup. Br. at 8 n.8.

     The new evidence pertaining to Bepalo was primarily put into the record by Aframax. See Aframax Sup. Br. at 2 ("to ensure that it would be able to adequately defend itself with admissible evidence (especially after Aframax learned at the 11th hour that Plaintiffs would not be conducting depositions), Aframax also voluntarily produced additional materials"). Aframax notes that Bepalo has had two shareholders in addition to B-Gas Holding, Ltd. ever since it was incorporated in January 2011: Lorentzen Skibs AS (10%) and Pareto Secondary Maritime Opportunity Fund (39%). Id. at 8–9. Nicolai Lorentzen, a co-owner of Lorentzen Skibs AS and a director of Bepalo since the company's formation, submitted a declaration. Id. at 9. Lorentzen declares:

11

- "Because of the relatively small percentage of ownership interest that Lorentzen Skibs AS would hold in the company, we insisted that there be minority shareholder protections as a condition of our participation in the business venture, so as to prevent a situation where the majority shareholder (here, B-Gas Holding Ltd.) could exert total and unilateral control over the company. We were not interested in merely being a blind investor in Bepalo Ltd." Lorentzen Decl. (dkt. 62-5) ¶ 4.
- "I participated in negotiating the Shareholder Agreement." Id. ¶ 5.
- "The Agreement provides that shareholders holding more than 10% and up to 50% of the shares of the Company are entitled to appoint a director to the Board of Directors. . . . For certain matters, the Agreement also requires a supermajority vote of at least five directors, one of whom shall have been nominated by a shareholder other than the majority shareholder." Id. ¶ 6.
- "In the spring of 2020, the gas market in Europe collapsed as a result of the Covid pandemic. As a result, Bepalo's revenue stream collapsed with it. The company's Board was confronted with an existential crisis not of its own making, and decisions had to be made how to address it. In June 2020, ultimately the Board decided to sell its shares in subsidiary B-Gas Maud Ltd., which owned the gas tanker B GAS MAUD, and lease back the vessel from the new owner so that the company could continue to maintain control of that asset anticipating that the market would eventually return to normalcy. The Board also decided to sell three small gas tankers that it owned, which had, more or less, reached their service life, and to lease back the tankers, which were still under charter to third parties." Id. ¶ 8.
- "As a result of these transactions, the company received an immediate cash injection of USD 1.65 million in June 2020. . . . The goal was to

weather the pandemic's financial storm.  These negotiations . . . fell through resulting in the company having to unilaterally cut charter hire payments by one-half to remain afloat.  Thereafter, the owners of four of the vessels initiated arbitration proceedings, and ultimately the company had no choice but to file for insolvency in Cyprus." Id. ¶ 9.[11]

- "The decisions described above were made by the board of Bepalo Ltd. on a unanimous basis, after having considered and discussed the business realities that existed as a result of the global pandemic, and the options that were available. . . . I did not simply defer to the position of Atle Bergshaven or any other board member—I believe that each decision reached was appropriate based on my own evaluation of the facts." Id. ¶ 10.

This declaration supports Aframax's positions, both about Bepalo's independence[12] and about the specific decisions in Spring and Summer 2020.  Given this additional evidence, Plaintiffs have failed to demonstrate that Bepalo is an alter ego of Bergshav Shipholding AS such that a judgment against Bepalo can be collected against another entity within that group.  "The first and most critical link in the alter-ego chain (i.e., from the alleged debtor-obligor Bepalo to its parent company) is therefore missing." See Aframax Sup. Br. at 11.

### B. Last Link: Aframax

#### 1. Previous Briefing

Also in the motion to vacate, Aframax essentially argued that the evidence did not

---

[11] Plaintiffs' improperly filed Reply disputes that Bepalo ever went into "a judicially supervised/controlled bankruptcy." Reply at 13.  The Court will not consider this argument as it has stricken the Reply.

[12] Of course, the "general rule" is that parents and subsidiaries are separate. See Harris Rutsky & Co. Ins. Servs., 328 F.3d at 1134.  Absent sufficient allegations of dominion/control, the Court need not even reach the questions of whether there would be injustice in failing to pierce the corporate veil and whether the controlling entity had fraudulent intent.  See Pac. Gulf Shipping Co., 992 F.3d at 898 (Ninth Circuit has a conjunctive test: all three elements must be present).

demonstrate its culpability. Aframax asserted that, comparing Table I and Table III from the Complaint (replicated above), "no assets of Bergshav Shipping Ltd., Bepalo (B-Gas Limited), or B-Gas AS are shown to have been transferred to [Aframax]—instead, all that is alleged are that assets and entities that were previously owned by Bergshav Shipping Ltd (or its subsidiaries) were ultimately transferred such that they are now owned by Bergshav Invest AS (or its subsidiaries)." Mot. at 10 (emphasis in original). Aframax insisted that "Aframax is completely absent from any relevant chain of ownership." Id. (emphasis in original); see also Transcript at 11:1–4 (Aframax counsel: "The plaintiffs' counsel referred to [Aframax] as a receiving entity, that is, a pocket. Well, it never received any monies that—that have been identified in any of the complaints."); id. at 14:8–10 (Aframax counsel: "There are no factual allegations that—that [Aframax] committed any tort, breached any contract, committed any fraud.").

It is true that in Table I and Table III, Aframax is unchanged: in both tables, it sits below Bergshav Shipping Ltd and it owns the Berica. See Compl. Table I, III. While Table I shows that B-Gas Ltd. (or Bepalo) owns 4 vessels (B Gas Maud, B Gas Crusader, B Gas Commander, and B Gas Champion), Table III shows that B Gas Ltd. (or Bepalo) owns nothing, and that the four B Gas vessels are all now owned by LPG Invest AS, which sits below Bergshav Invest AS. Id. Aframax argued accordingly that "Aframax had no direct connection to the alleged fraud which purportedly justifies piercing the corporate veil"—the "asset stripping" from Bepalo. Mot. at 1.

Concerned about this issue at the motion hearing, the Court prompted Plaintiffs: "The argument that I heard the defendants making is what can you point to regarding Aframax that brings it in as—as the alter ego? Because it is the defendant that owns the vessel [Berica], as I understand it." Transcript at 17:14–17. Plaintiffs responded that they needed discovery. Id. at 18:16–17. In allowing discovery, the Court encouraged Plaintiffs to focus on "the relationship of Bergshav Aframax to the alleged fraud." Order Continuing Hearing, Permitting Discovery, and Setting Briefing Schedule.

14

        2.        **New Evidence**

Plaintiffs now point to new evidence of what they allege to be "extensive commingling of funds between Bergshav Shipholding AS . . . and [Aframax]," "the ad hoc informality accounting treatment of intercompany transfers," "the establishment of B-Gas Holding Ltd., a shell entity admittedly [created] to cabin existing risks of the direct parent company of [Aframax]," "the fraudulent concealment from Plaintiffs of the sale of all of the assets of B-Gas Limited to LPG Invest AS," "the undercapitalization of B-Gas Ltd.," "the concentration of valuable assets in LPG Invest AS and [Aframax]," and "the concentration of liabilities in B-Gas Limited and B-Gas Holding Ltd." Plaintiffs' Sup. Br. at 13–14; see also id. at 4–11.

Some of this evidence relates to Aframax. Specifically, Plaintiffs point to the Bergshav Group transferring funds to Aframax and dictating how those funds would be entered in Aframax's accounting system, bailing Aframax out with injections of funding, and providing commitments on behalf of Aframax in connection with debts. See id. at 18–19. Aframax counters that "these transfers do not represent improper 'commingling' of funds," as the transactions were duly recorded, and that what Plaintiffs deem "'ad hoc' informality of intercompany transfers" is "routine in Norway—the transfers need only be properly recorded for tax, accounting and auditing purposes at years' end." Aframax Sup. Br. at 14. In any case, such evidence only relates to the Ninth Circuit's requirement that to pierce the corporate veil, a parent must "exercise[] total domination of the subservient corporation, to the extent that the subservient corporation manifests no separate corporate interests of its own." See Pacific Gulf Shipping Co., 992 F.3d at 898.

Most of Plaintiffs' new evidence does not relate to Aframax. Aframax did not establish B-Gas Holding, conceal information from Plaintiffs, undercapitalize B-Gas Limited, or concentrate liabilities anywhere.[13] Plaintiffs do not point to any "concentration

---

[13] There is therefore little evidence in support of the Ninth Circuit's additional requirement that "injustice will result from recognizing the [subservient entity] as a separate entity." See Pacific Gulf Shipping Co., 992 F.3d at 898. Plaintiffs' argument that "it would be inequitable to allow the subservient entity [Aframax], or any subservient entity of Bergshav Shipholding AS, to be recognized as a separate entity," Plaintiffs' Sup. Br. at 20,

15

of valuable assets" in Aframax in connection with B-Gas Ltd.; in fact, Plaintiffs explicitly do not contend that Aframax participated in the asset-stripping of B-Gas Ltd. See Plaintiffs' Sup. Br. at 14. Plaintiffs do point to a number of transactions between April 2020 and June 2020 in which Bergshav Shipholding AS can be seen directing the conduct of its subsidiaries, specifically in connection with B-Gas Ltd. See id. at 8–11. These transactions may or may not be above board. See, e.g., id. at 8 (quoting 4/27/20 Hannevik email: "We would like to make a few changes to the legal structure of Bergshav in Cyprus to separate the various assets and risks better."); id. Ex. 15 (June 3, 2020 Bergshav Group "Notat" re B-Gas Ltd. structure, mentioning "disposal of assets to increase the Company's liquidity," and anticipating litigation by Plaintiffs if B-Gas Ltd. reduced bareboat charter hire).[14] But they do not involve Aframax.

To pierce the corporate veil, "[t]he entity sought to be held liable must be involved in misuse of the corporate form." d'Amico Dry d.a.c. v. Nikka Fin., Inc., 429 F Supp. 3d 1290, 1302 (S.D. Ala. 2019); see also id. ("fraud analysis focuses on 'whether the corporate form itself was abused and whether the misuse of the corporate form constituted the fraud or injustice complained of in the underlying suit.'"); Pac. Gulf Shipping Co., 992 F.3d at 899 (entity to be held liable under an alter-ego theory must itself have been "used . . . for a fraudulent purpose."). Given Tables I and III, and Plaintiffs' concession, see Plaintiffs' Sup. Br. at 14 ("It is not Plaintiffs' case that [Aframax] participated in the asset-stripping [of] B-Gas Limited."), it is hard to see how Aframax was involved in the alleged fraud here: the asset-stripping from Bepalo.

Plaintiffs argue, though, that they need not demonstrate that Aframax was itself

---

is not especially compelling when Aframax played no role in Plaintiffs' harm. Moreover, "a creditor's inability to collect a judgment alone is insufficient to justify piercing the corporate veil." Eitzen Chem. (Singapore) PTE, Ltd. v. Carib Petroleum, 749 F. App'x 765, 773 (11th Cir. 2018).

[14] Aframax moves to strike Exhibit 15 as untimely. See Ex Parte Mot. to Strike and Preclude (dkt. 59). The Court denied that motion without prejudice to the parties raising those issues again at the motion hearing. See Order Denying Ex Parte Mot. to Strike and Preclude (dkt. 60). The issue did not come up again at the motion hearing. In any case, it is a document that was generated by the Bergshav Group and therefore may have already been in Aframax's possession.

used for a fraudulent purpose. Id. at 16. Plaintiffs observe that the Ninth Circuit in Pacific Gulf Shipping Co. required that the plaintiffs demonstrate that the alleged alter ego defendants dominated and controlled either the corporate owner of the attached vessel or its holding company, and used the corporate form for a fraudulent purpose. Plaintiffs' Sup. Br. at 16. This is correct, but in Pacific Gulf Shipping Co., 992 F.3d at 895–96, both the vessel owner and the holding company had appeared; in this case, only Aframax, the vessel owner, has appeared. Aframax notes that the court in Pacific Gulf Shipping Co. relied on M/V American Queen v. San Diego Marine Construction Corp., 708 F.2d 1483 (9th Cir. 1983), which clarifies the point. See Aframax Sup. Br. at 17 (citing Pacific Gulf Shipping Co., 992 F.3d at 899) (citing M/V American Queen, 708 F.2d at 1490)). In M/V American Queen, 708, F.2d at 1489–90, the Ninth Circuit held:

> To disregard San Diego Marine's [the subsidiary's] corporate existence . . . there must be more than just its control by Campbell [the parent company]. There must be factors that indicate a disregard of San Diego Marine's corporate form. . . . Further, it must appear that injustice will result from recognizing San Diego Marine as a separate entity and that Campbell had a fraudulent intent or an intent to circumvent statutory or contractual obligations in its control of San Diego Marine.

The court went on to say that if the alter ego theory was correct, "Campbell would be liable only if San Diego Marine were also liable." Id. at 1490. Thus, the court held that, to pierce the subsidiary's corporate veil, the parent company had to have a fraudulent intent in its use of the subsidiary. See also Blankenship v. Omni Catering, Inc., 21 F.3d 1111 (9th Cir. 1994) (unpublished) ("Fraudulent intent may be proved in either of two ways: through evidence of fraudulent intent in the formation of the corporation or through evidence of the subsequent misuse of the corporate form to perpetrate a fraud.") (citing Board of Trustees v. Valley Cabinet & Mfg. Co., 877 F.2d 769, 774 (9th Cir. 1989)). Here, because Plaintiffs do not even allege that Aframax was used to perpetrate a fraud relating to B-Gas Ltd., see Plaintiffs' Sup. Br. at 14 ("It is not Plaintiffs' case that [Aframax] participated in the asset-stripping [of] B-Gas Limited."), they fail to meet the requirement that "the controlling entity had a fraudulent intent or an intent to circumvent

statutory or contractual obligations." See Pacific Gulf Shipping Co., 992 F.3d at 898.

Plaintiffs do make a last ditch claim of having shown that Aframax was "involved in misuse of the corporate form." See Plaintiffs' Sup. Br. at 14–15; d'Amico Dry d.a.c., 429 F Supp. 3d at 1302. They argue:

> "[I]nvolved in the misuse of corporate form" as held in d'Amico Dry d.a.c. is not co-extensive in meaning with "participated" as Defendant cites and argues. It is not Plaintiffs' case that [Aframax] participated in the asset stripping [of] B-Gas Limited. But this is not to say that [Aframax] was not involved in the unjust actions of the Bergshaven Group in this case. Specifically, Bergshav Shipping Ltd., the direct parent company of [Aframax], <u>transferred its controlling interest over B-Gas Limited (Plaintiffs' debtor) for the price of $1 in pursuit of a deliberate, well considered plan to remove the risk of the contemplated insolvency of B-Gas Limited from Bergshav Shipping Ltd.</u> (emphasis added). This demonstrates Defendant's involvement in the bad acts alleged by Plaintiffs. In the very words of Mr. Hannevik, the Chief Financial Officer of the Bergshaven Group, the intent of the restructuring was: "To confine the risk of [B-Gas Limited] to B Gas Holding Ltd. for USD 1.00."

Plaintiffs' Sup. Br. at 14–15 (emphasis in original); see also id. at 15 (speaking to "the Bergshaven Group's intent" and to fraudulent actions by "Bergshav Shipping Ltd. and Bergshav Shipholding AS"). The block quote above demonstrates nothing about Aframax. Allegations about what Bergshav Shipping Ltd. did are not allegations about what Aframax did—even if prefaced with the word "Specifically" and sandwiched by assertions that Aframax was involved.

Given Plaintiffs' failure to point to new evidence of Aframax's involvement in the alleged fraud, Plaintiffs have failed to demonstrate that Aframax's corporate veil is subject to veil piercing in order to recover for Bepalo's debt.

C.     **Additional Arguments**

Finally, Plaintiffs make two arguments for the first time in their supplemental brief: that this Court may "look into an allegedly fraudulent transfer where the question was relevant to execution upon a decree in admiralty," and that the entire Bergshav Group is a single business enterprise. See Plaintiffs' Sup. Br. at 21–26. These arguments are unavailing.

Plaintiffs have already conceded that Aframax was not directly involved in the allegedly fraudulent transfers of which they complain. See Plaintiffs' Sup. Br. at 14.

Plaintiffs' argument under California's single business enterprise doctrine is also flawed. Federal, not California, law governs the Court's alter ego analysis. See Pacific Gulf Shipping Co., 992 F.3d at 897. While state law can be used where it is not inconsistent with admiralty principles, see Kite Shipping LLC v. San Juan Nav. Corp. No. 11-cv-02694 BTM (WVG), 2012 WL 6720624, at *3 (S.D. Cal. Dec. 26, 2012) ("Courts applying federal common law in an admiralty case 'can look to state law in situations where there is no admiralty rule on point.'") (quoting Ost-West-Handel Bruno Bischoff GmbH v. Project Asia Line, Inc., 160 F.3d 170, 174 (4th Cir. 1998)), here, it is inconsistent. Admiralty principles require both domination and control and that the subservient entity be used "for a fraudulent purpose." See Pacific Gulf Shipping Co., 992 F.3d at 899.[15]

Accordingly, the Court rejects both arguments.[16]

---

[15] In addition, Plaintiffs' single business enterprise argument is based largely on the expert report of a forensic accountant named Michael Molder. See Molder Decl. (Plaintiffs' Sup. Br. Ex. 28). Aframax moves to strike that declaration as untimely. See Ex Parte Mot. to Strike and Preclude. Aframax argues that the discovery cut-off was October 31, 2022, but that some of Plaintiffs' exhibits, including Exhibit 28, were not produced until November 28, 2022. Id. at 1. Aframax contends that it was prejudiced by the late production and unable to respond. Id. at 7. This Court denied that motion without prejudice to the parties raising it again at the motion hearing. See Order Denying Ex Parte Mot. to Strike and Preclude. It did not come up again at the motion hearing. In any case, the Court would limit the impact of the Molder report because Molder largely opines on a legal conclusion: whether the Bergshav Group operates as a single business enterprise. See Molder Decl. (dkt. 58-28) ¶ 7 ("The interlocking Boards of Directors, shared management and intercompany transfers dressed up as preferred share transactions indicate that the Group is actually a single entity.").

[16] For the sake of completeness, the Court addresses a final argument. Plaintiffs argued in their opposition to the motion to vacate—but did not repeat in their supplemental briefing—that they can also attach the Berica via reverse veil piercing. Opp'n at 10. Plaintiffs relied on Pacer Construction Holdings Corp. v. Pelletier, No. 19-cv-1263-MMA (BGS), 2020 WL 583982, at *4 (S.D. Cal. Feb. 6, 2020), which defined reverse veil piercing as a tool used "to satisfy the debt of an individual through the assets of an entity of which the individual is an insider." See id. at 10–11. Plaintiffs asserted that "[t]he individual insider in this instance is Atle Bergshaven, 100% owner of Bergshav Aframax Ltd., through the chain of ownership of this corporate entity as set out in the Verified Complaints . . . and his own identification as the 'ultimate controlling party in its financial statements it filed in Cyprus." Id. at 11. The problem with this argument is that it relies on calling Atle Bergshaven the "shareholder debtor," see id. at 12, but he is not; Bepalo/B-

19

## IV. CONCLUSION

For the foregoing reasons, the Court cannot attach property belonging to Aframax in order to recover for a debt of Bepalo's. The Court therefore GRANTS the motion to vacate. However, the Court STAYS this order for 30 days so that Plaintiffs may seek a further stay in the Ninth Circuit Court of Appeals if they wish to do so.

**IT IS SO ORDERED.**

Dated: January 19, 2023



CHARLES R. BREYER
United States District Judge

---

Gas Limited is the debtor, see Compl. at 1 ("Plaintiff . . . is an arbitration award-creditor of defendant B-Gas Limited.").